# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 94-127-13 |
| SALVATORE BRUNETTI | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Salvatore Brunetti seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the danger that the defendant presents to the community, and the fact that his medical conditions are well controlled with treatment in BOP custody.

## I.    Background.

### A.    Criminal Conduct.

On June 28, 1995, a grand jury in the Eastern District of Pennsylvania returned a second superseding indictment charging 18 members of the La Cosa Nostra Enterprise (LCN) led by John Stanfa, with Racketeer Influenced and Corrupt Organizations (RICO) offenses, in violation of 18 U.S.C. § 1962. Defendant Salvatore Brunetti was a named defendant in Counts One and Two (which charged all the defendants with conspiring to conduct the affairs of the Enterprise through a pattern of racketeering activity), and a named defendant in RICO Act One (which charged conspiracy to murder 12 members of

a rival LCN faction aligned with Joseph Merlino); RICO Act Four A (which charged Brunetti and two other conspirators with the attempted murder of Joseph Merlino from August 1, 1993, through August 4, 1993); and Rico Act Five (which charged Brunetti and three other conspirators with the attempted murder of Steve Mazzone). Brunetti proceeded to trial, and on May 15, 1996 the jury found Brunetti guilty of all the RICO offenses and acts charged against him. On May 8, 1997, the district court imposed a sentence of 40 years' imprisonment, and a term of supervised release of three years.

The LCN Enterprise that Brunetti was a member of existed from about October 1990 through March 16, 1994, and engaged in activities which affected interstate commerce. The Enterprise existed to control, manage, finance, supervise, participate in, and set policy concerning the making of money through legal and illegal means in the Philadelphia area and in part of New Jersey. The Enterprise was organized in a chain of command headed by a boss (Stanfa). There was a consigliere, an underboss, caporegime men, "made" soldiers and associates. Brunetti was an associate who worked in the Enterprise under the direction of the "made" soldiers. To enforce the rules of the Enterprise, promote discipline and continue receipt of money to the LCN, "made" soldiers and associates of the Enterprise murdered, attempted to murder, and conspired to murder individuals and associations who violated the rules, questioned authority, posed a threat to the leaders, jeopardized its' operations, or threatened its' ability to generate money.

A method of acquiring wealth for the Enterprise involved systematic extortions and gambling. The LCN conspirators extorted money and other things of value by

"shaking down" persons who were involved in criminal activity and in legitimate businesses. The LCN conspirators also operated illegal gambling businesses involving both numbers and sports books, and made unlawful extensions and collections of credit, using the Enterprise's violent reputation to force victims to pay illegal interest and to repay loans. LCN members also participated in obstruction of justice by using attorney and doctor offices as a disguise to conduct their meetings as privileged attorney-client and doctor-patient communications.

Specifically, to carry out the attempted murder of 12 members of the rival LCN faction aligned with Joseph Merlino (RICO Act One), Brunetti directed the purchase of gunpowder for use in making bombs, and participated in building, testing, and attempting to detonate pipe bombs. Brunetti also provided cyanide for use in the plot to kill Merlino, and tried to recruit a female to place cyanide in Merlino's drink. Brunetti also participated in a viewing of videotape footage of Merlino and his associates attending a wake so that he would be able to identify the 12 targets to be murdered, and Brunetti shared this videotape and photographs with other LCN associates so they knew who was to be killed.

Brunetti also was a part of the LCN team who attempted to murder Joseph Merlino from August 1, 1993, through August 4, 1993 (RICO Act Four A). Brunetti made several attempts to kill Merlino. Brunetti and other LCN associates carried a high-powered rifle with a scope, as well as a homemade bomb, which they intended to place under Merlino's car. One attempt involved a plan to shoot Merlino with a rifle from the roadside of I-95 which overlooked Merlino's residence on Cuthbert Street in Philadelphia. Another

attempt involved Brunetti following Merlino to a funeral home planning to shoot him, but there were too many people nearby.[1]

Brunetti was also one of four LCN members who attempted to murder Steve Mazzone on August 5, 1993 (RICO Act Five). At the direction of Stanfa, Brunetti met with leaders and other associates at a garage on Juniper Street and the "egg" bomb that was used in prior attempts to murder Merlino and his associates was at the garage. Brunetti and the other LCN members agreed to set out to find and murder Mazzone and then meet back up at the garage after any hit. The plan was to drive in two cars to the area of 28th and Grays Ferry Avenue, where Mazzone was known to drive a white Maxima. Two LCN members were designated shooters, two others to be blockers, and Brunetti was to be the getaway driver. The plan was called off after police infiltrated the area. Later that day, involved LCN members were stopped by police and guns, masks, and gloves were located in their car.

Defendant Brunetti is serving his sentence at FCI Fort Dix, with an anticipated release date of June 21, 2028. He has committed seven disciplinary infractions during his time in custody. The infractions consist of the following: October 14, 2014 - found in possession of contraband (prohibited food items); May 1, 2007 - found to refuse to obey orders and be absent from assignment; September 30, 2003 - found to be absent from assignment; April 24, 2003 - found to be absent from assignment; June 20, 2000 -found to be in possession of a dangerous weapon (sharpened metal); March 6, 2000 -found to

---

[1] On August 5, 1993, two LCN Enterprise members did shoot and kill Michael Ciancaglini (targeted Merlino associate) and wound Joseph Merlino.

commit disruptive conduct; and February 17, 2000 - found to give/accept money (conduct gambling).

Brunetti also has a violent past, documented in multiple state convictions prior to being charged and convicted in the federal RICO case. Brunetti has two assault convictions in Philadelphia Court of Common Pleas from 1982 and 1984 where in each instance he broke down an apartment door and forcefully entered another's residence and physically assaulted the victim. In 1982 he was convicted of simple assault for causing eye injury to the victim of the home invasion, but in 1984 he was convicted of aggravated assault for causing a broken nose, broken teeth, and a fractured vertebrae to the victim. Brunetti also has a drug conviction from Camden County, New Jersey from 1980 where he was stopped driving a vehicle and had cocaine inside. These past convictions and disciplinary infractions while incarcerated need to be considered by the Court, because if released Brunetti would present a serious danger to the community.

**B.     Request for Compassionate Release.**

On May 7, 2020, the defendant submitted a request for compassionate release to the warden. The request was based on the following medical conditions: deteriorating health and post-surgery (2018) scar tissue chest pain and irritation, as well as the risk presented should the defendant contract COVID-19. On May 15, 2020, the defendant, pro se, submitted a motion to this Court for compassionate release.

The undersigned obtained the medical records of the defendant for the past year from BOP. The records reveal that the defendant, who is 72 years old, presents aching in his right hand, post-surgery scar tissue chest pain and irritation (2018 surgery was to

remove a mediastinal lesion), and regular eye care for swollen and aging eyes. All of these conditions appear well-controlled at this time with medication provided by the institution and regular medical trips to NJRetina for vision care. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living (ADLs).

### C. BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a

minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page:

www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Attach. 2 (Mem. for Director of Bureau of Prisons). As of this filing, BOP has transferred over 4,500 inmates to home confinement under this program.[2]

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b)

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

The effort has been successful thus far at Fort Dix, where Brunetti is held. At present, there are 14 inmates who have tested positive for COVID-19, while 29 additional inmates have recovered. However, all were held in a low-security camp. Brunetti is held, along with thousands of others, in the "low" facility, where there has not been any reported positive case.

The conditions at Fort Dix were explained at length in late May in *Wragg v. Ortiz*, 2020 WL 2745247 (D.N.J. May 27, 2020), which dismissed for lack of jurisdiction a habeas action filed by Fort Dix inmates challenging the current conditions. The court explained that all inmates who have tested positive in the complex were located in a minimum security camp, which currently holds 197 inmates (a fact that remains true). There also has not been a death of an inmate in the entire complex. The court further

---

(BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act."); *United States v. White*, 2020 WL 1906845, at *2 (E.D. Va. Apr. 17, 2020); *United States v. Skaff*, 2020 WL 1666469 (S.D.W. Va. Apr. 3, 2020).

explained the protocols in place at FCI Fort Dix, including the thorough cleaning of the

facility and how "[a]ll inmates are regularly screened for symptoms of infection and all

activities are managed so as to minimize congregate activity and promote distancing." *Id*.

at *3-6; *see also, e.g.*, *id*. at *9 (noting how "FCI Fort Dix continues to use guidelines and

advice from multiple sources, including but not limited to, the BOP's Health Services

Division – Central Office, the Centers for Disease Control, the State of New Jersey's

Health Department, and the Burlington County Health Department").

In light of its findings, the district court concluded that it "does not find this case

to be that 'extraordinary case' where it should expand habeas jurisdiction." *Id*. at *19.

Furthermore, the court determined that "[e]ven assuming [it] has habeas jurisdiction, . . .

in the alternative, [p]etitioners have not met their burden to obtain preliminary injunctive

relief." *Id*. at *20. Indeed, "neither the allegations as pled nor the evidence presented to

the [c]ourt . . . demonstrates that the Respondents have been deliberately indifferent to

the inmates' risks of contracting COVID-19." *Id*. at *22 (explaining preventative

measures being taken by BOP).

## II.    Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the

First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not
> modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon
> motion of the defendant after the defendant has fully exhausted all administrative

rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)   extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

---

[3]  Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  Medical Condition of the Defendant.—
>
> (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii)  The defendant is—
>
> (I)  suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
> >
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The defendant is not eligible for compassionate release, because he does not present an "extraordinary and compelling reason" as stated in the governing guideline

policy statement. The defendant does not present any of the health or family circumstances identified in the guideline, and instead presents a concern only based on the risk of acquiring COVID-19 in the prison environment. But the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").[4]

---

[4] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants

The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. But the defendant presents no such condition.

Likewise, Brunetti is not eligible for consideration under the age provision in note 1(B). He is over 65 years old, and has served more than 10 years, but he is not "experiencing a serious deterioration in physical or mental health because of the aging process."

Even if the defendant were eligible for consideration (which he is not), relief should be denied. This Court would then be required to consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, his medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

---

with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

Moreover, he continues to present a danger to the community, and should be required to serve the sentence that this Court imposed for his criminal conduct. The defendant was a confederate in a RICO conspiracy that spanned a four-year period where violent murders were committed and multiple violent attempts to murder planned and committed.

The defendant fails to demonstrate how release, 26 years into a 40-year sentence for serious racketeering offenses, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the RICO offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Jepsen*, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) ("Mr. Jepsen is in the unique position of having less than eight weeks left

to serve on his sentence, he is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19, and the Government consents to his release."); *United States v. Lacy*, 2020 WL 2093363 (C.D. Ill. May 1, 2020) (31-year-old man is obese and suffers from hypertension and diabetes; four months remaining on sentence); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense); *United States v. Sedge*, 2020 WL 2475071 (E.D.N.Y. May 13, 2020) (released with 8 months remaining on 72-month drug sentence, due to "hypertension, hyperlipidemia and coronary artery disease, family medical history, and the rapid rise of COVID-19 infections at FCI Danbury."); *United States v. Rodriguez*, 2020 WL 3051443 (S.D.N.Y. June 8, 2020) (granted due to "psoriatic arthritis, an autoimmune disorder for which he is prescribed an immunosuppressant that weakens his body's ability to fight infections," and asthma; has only seven months left to serve on 60-month term); *United States v. Moore*, 2020 WL 2572529, at *2 (D. Or. May 21, 2020) (inmate with respiratory disease released with four weeks left in 57-month 922(g) sentence); *United States v. Van Cleave*, 2020 WL 2800769 (W.D. Wash. May 29, 2020) (granted to inmate who suffers from hypothyroidism and sarcoidosis (a rare inflammatory disease that can affect multiple organs of the body, most commonly the lungs), and has less than five months remaining on 20-year sentence); *United States v. Blye*, 2020 WL 3064225 (W.D. Wash. June 9, 2020) (defendant at SeaTac with respiratory issues has only five months to serve for drug offenses; he "has a lengthy and troubling criminal history," but "defendant's past

offenses were almost all drug-related and non-violent, and defendant has a near-perfect prison disciplinary record."); *United States v. Kidd*, 2020 WL 3270850 (E.D. Wis. June 17, 2020) (released with two months remaining on one-year sentence for nonviolent theft offense, due to lung ailments and other conditions).

Even when the inmate presents a serious health condition (which is not the case here), courts have denied compassionate release to offenders such as Brunetti who, because of their devotion to organized crime, plainly present a continuing risk of danger to the community. *See, e.g.*, *United States v. Urso*, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019) (the court cannot say that the defendant, a long-time high-ranking mobster, no longer presents a danger to the community); *United States v. Gotti*, 2020 U.S. Dist. LEXIS 8612 (S.D.N.Y. Jan. 15, 2020) (the defendant "has established that he suffers from a plethora of serious, debilitating, and progressive medical conditions. However, he has not shown that he has a terminal illness or a serious physical or medical condition that has substantially diminished his ability to provide self-care within the environment of a correctional facility"; in addition, as the former leader of an exceeding violent organized crime organization, he presents a continuing danger); *United States v. Montevecchi*, 2020 WL 3051335 (S.D.N.Y. June 8, 2020) (organized crime member has served only small part of 30-month sentence; denied notwithstanding health conditions); *United States v. Levario*, 2020 WL 3256918 (E.D. Cal. June 16, 2020) (inmate at Oakdale is vulnerable, but denied due to violent participation in drug gang); *United States v. Miranda*, 2020 WL 2124604 (D. Conn. May 5, 2020) (55-year-old has diabetes; has served 54 months of 74-month term for drug crime; denied in light of history of drug

crimes and threatened violence); *Walker v. United States*, 2020 WL 2308468 (S.D. Fla. May 8, 2020) (regardless of medical condition, declines to reduce life sentence after 16 years; instant and earlier offenses were very violent); *United States v. Roberts*, 2020 WL 3046106 (E.D. Mich. June 8, 2020) (denial of 4-year reduction in 180-month sentence, notwithstanding health conditions, as Danbury inmate is former Devil's Disciples members who has a long history of violence and improper sexual behavior); *United States v. Epstein*, 2020 WL 2537648 (D.N.J. May 19, 2020) (74-year-old defendant suffers from numerous ailments, but he is receiving proper treatment, and his kidnapping offenses were "severe and violent"); *United States v. Walter*, 2020 WL 1892063 (S.D.N.Y. Apr. 16, 2020) (denied due to violent acts as gang member, notwithstanding risk of COVID-19 as gunshot victim); *United States v. Nieves*, 2020 WL 2476185 (S.D.N.Y. May 13, 2020) (defendant has served half of 192-month term, and participated in "a long running narcotics conspiracy that involved a murder.").

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Kelly A. Lewis Fallenstein*
KELLY A. LEWIS FALLENSTEIN
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this pleading has been served by first-class mail, postage prepaid, upon:

> Mr. Salvatore Brunetti
> USM # 07781-062
> FCI Fort Dix
> P.O. Box 2000
> Joint Base MDL, NJ  08640

/s Kelly A. Lewis Fallenstein
KELLY A. LEWIS FALLENSTEIN
Assistant United States Attorney

Dated:  July 1, 2020.