**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  94-127-13** |
| | : | |
| **SALVATORE BRUNETTI** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                      **July 31, 2020**

Over the last four months, hundreds of incarcerated persons around the country have moved for compassionate release from their final prison sentences based on their perceived risk of harm from the spread of COVID-19 in our federal prisons.  We appreciate this fear. We today evaluate a seventy-three-year-old man seeking compassionate release after being convicted of participating in violent crimes as a trusted forty-six-year old member of Philadelphia's former organized crime boss John Stanfa's La Cosa Nostra.  He provided experience with bombs.  Judge Buckwalter carefully considered the evidence and sentenced the mature man to a forty-year sentence in 1997.  Like all of us, he faces illness which come with getting older. But until the COVID-19 pandemic, he did not move for compassionate release.  After carefully analyzing his motion for release, and while he may possibly demonstrate extraordinary and compelling reasons for release based on combination of the risks presented by his medical condition in a prison addressing COVID-19 spread, we agree with his most recent wife's concern  he is a "violent person who couldn't change."  He presents too great a danger of violence to the public and his release is not warranted under Congress's sentencing factors.   We decline to reduce Judge Buckwalter's final sentence.

I.      **Facts**[1]

Salvatore Brunetti turned seventy-three years old earlier this month while serving a forty-year sentence at FCI-Fort Dix.   His present custodial status arises long after enduring a difficult upbringing.[2]  His parents separated when he was three years old.[3] His mother remarried Frank Marche, and her and Mr. Marche abused Mr. Brunetti as a child.[4] Mr. Brunetti entered foster care at age twelve where he remained until joining the United States Army in 1965.[5]

Mr. Brunetti has a documented history of mental illness and substance abuse.[6] Military records indicate Mr. Brunetti exhibited a degree of psychiatric impairment not conducive to further military service.[7]  Since serving, Mr. Brunetti attempted suicide and experienced depression.[8] Doctors at FCI-Butner found a possible diagnosis of borderline personality disorder and drug dependence.[9]  Mr. Brunetti has an extensive alcohol and drug dependency dating back to age eighteen, including reported use of alcohol, marijuana, cocaine, cocaine base, amphetamines and methamphetamines, heroin and other opiates, barbiturates, and hallucinogens.[10]

Throughout his mental illness and substance abuse, Mr. Brunetti maintained steady employment.  From 1979 until 1983, Mr. Brunetti worked for Abington Refineries.[11]  For the next twelve years, Mr. Brunetti worked at Marche Jewelers, a family business in Oaklyn, New Jersey, as its controller.[12] And for four years Mr. Brunetti worked for ANA Laboratories in Bellmawr, New Jersey as a vice-president for marketing and technical support.[13]

Mr. Brunetti married three times.  He married Mary McGee in 1970 and divorced eight years later.[14]  Mr. Brunetti and Ms. McGee had two children.[15]  Mr. Brunetti then married Karen Snyder in 1979 but the two separated four years later and then divorced without having children.[16] Mr. Brunetti then married Denise Camp in 1989.[17]  Mr. Brunetti and Ms. Camp had one son and

raised Ms. Camp's two children from a previous marriage.[18]  Mr. Brunetti and Ms. Camp have since divorced.  Ms. Camp described Mr. Brunetti as a "violent person who couldn't change."[19]

Consistent with Ms. Camp's description of her ex-husband, Mr. Brunetti's conduct before his present federal sentence reveals a violent criminal history.  In 1982, a court convicted Mr. Brunetti of simple assault after he broke down an apartment door, entered the residence, and beat the victim.[20]  Two years later, a court convicted him of aggravated assault when he broke down the apartment door of his ex-wife (Ms. McGee), entered the residence, and repeatedly beat and kicked her.[21]  She suffered a broken nose, broken teeth, and a fracture to her vertebrae. [22]

**A.** **Mr. Brunetti applies his violent nature and explosives expertise to further John Stanfa's La Cosa Nostra.**

In the early 1990s, Mr. Brunetti chose to participate in Philadelphia's La Cosa Nostra Enterprise led by John Stanfa ("the Enterprise").  From about October 1990 through March 1994, the Enterprise attempted to control, manage, finance, supervise, participate in, and set policy of illicit money-making schemes.[23]   The Enterprise organized illegal gambling businesses and extorted money through "shaking down" persons in both criminal and legitimate enterprises.[24] The Enterprise operated with a sophisticated and organized hierarchy under boss John Stanfa.  Mr. Stanfa staffed a consigliere, an underboss, caporegime men, "made" soldiers, and associates.[25] "Made" soldiers and associates enforced the Enterprise's goals, rules, and operations by murdering, attempting to murder, and conspiring to murder individuals and members of rival groups.[26]

A rival organized criminal enterprise led by Joseph Merlino presented itself as the Enterprise's primary foe.[27]  Tensions between the Enterprise and the Merlino faction escalated when someone shot Enterprise underboss Joseph Ciancaglini in the parking lot of a South

Philadelphia diner on March 2, 1993.[28]  The Enterprise responded by recruiting members as "hit crews" against Merlino members.[29]

The Enterprise brought in Mr. Brunetti "for his expertise with making bombs."[30]  Mr. Brunetti and other Enterprise members met at a Wawa off to exchange information,  coordinate teams, and discuss logistics to carry out the "hits" of Merlino and his men.[31]  During this meeting, one member reassured another member he could trust Mr. Brunetti because Mr. Brunetti had done "work" before, i.e., killed.[32]

After the Wawa meeting, Mr. Brunetti directed the purchase of gunpowder for use in making bombs, and participated in building, testing, and attempting to detonate pipe bombs.[33]  Mr. Brunetti also provided cyanide to kill Merlino, and tried to recruit a woman to place cyanide in Merlino's drink.[34]  Mr. Brunetti also participated in viewing videotape footage of Merlino and his associates attending a wake so he would be able to identify the twelve targets to be murdered, and Mr. Brunetti shared this videotape and photographs with his fellow hitmen so they knew who to murder.[35]

From August 1 through August 4, 1993, Mr. Brunetti and other Enterprise members made several attempts to kill Merlino.[36]  They carried guns, including a high powered rifle with a scope, as well as a homemade bomb, which they intended to place under Merlino's car.[37]  One attempt involved a plan to shoot Merlino with a rifle from the roadside of an interstate highway overlooking Merlino's residence.[38] Another attempt involved Mr. Brunetti following Merlino to a funeral home planning to shoot him before aborting the attempt because there were too many people nearby.[39]

On August 5, 1993, Mr. Brunetti and four others set out to murder Steve Mazzone, an associate of Merlino.[40]  They drove in two cars to the area of 28th Street and Gray's Ferry Avenue in Philadelphia.[41]  The men planned for Mr. Brunetti to drive the getaway car but called off the

attempt after seeing police in the area.[42]  After this attempt failed, two Enterprise members dropped off Mr. Brunetti at home and then returned to Merlino's "clubhouse" at 6th Street and Catherine Street.[43]  At this location,  the Enterprise members shot Merlino and Michael Ciancaglini, killing Ciancaglini.[44]  Stanfa rewarded these two members and Mr. Brunetti with $300 a week for the murder.[45]

### B.      Mr. Brunetti's conviction and present sentence.

Mr. Brunetti entered custody after a March 18, 1994 arrest.[46]  Our grand jury returned a second superseding indictment in June 1995 charging then-forty-six-year-old Mr. Brunetti and seventeen other members of the Enterprise, including Mr. Stanfa, for engaging in organized crime under the Racketeer Influenced and Corrupt Organization Act.[47]  Our grand jury specifically charged Mr. Brunetti in the first two of thirteen counts for his roles in the attempted murder of the leader of a rival enterprise, Joseph Merlino, the conspiracy to murder twelve members of Merlino's group, and the attempted murder of Steve Mazzone.[48]

In May 1996, a jury found Mr. Brunetti guilty of both charges against him.[49]  On May 8, 1997, Judge Buckwalter sentenced Mr. Brunetti to forty years' imprisonment—twenty years for each offense to run consecutively—with a term of supervised release of three years.[50]

Mr. Brunetti has now served over twenty-six years in prison.[51]  He has an anticipated release date of June 21, 2028.[52]  Mr. Brunetti is serving his sentence at FCI-Fort Dix.[53]

### C.      Mr. Brunetti's disciplinary history and health in prison.

Mr. Brunetti committed seven disciplinary infractions in prison while in his late forties, fifties, and sixties.[54]  The incidents transpired over a fourteen-year period: October 14, 2014 - found in possession of contraband (prohibited food items); May 1, 2007 - found to refuse to obey orders and found to be absent from assignment; September 30, 2003 - found to be absent from

assignment; April 24, 2003 - found to be absent from assignment; June 20, 2000 - found to be in possession of a dangerous weapon (sharpened metal); March 6, 2000 - found to commit disruptive conduct; and February 17, 2000 - found to give/accept money (conduct gambling).[55]

Following the onset of the global COVID-19 pandemic, Mr. Brunetti alleges he now suffers from "medical issues put[ting] a daily major strain on his respiratory system."[56]  We have no evidence of him earlier raising these issues.   But his earlier medical history confirms a variety of medical concerns never giving him reason to move for compassionate release before today.   For example, Mr. Brunetti has a history of thymoma in his chest.[57]  He received an effective 2018 surgery to remove thymoma nodules in his chest but has experienced persistent pain on the incision site for the past eighteen months and still feels frequent shortness of breath.[58]  Mr. Brunetti also suffers from serious eye conditions, including hypertensive retinopathy, branch retinal vein occlusion, epiretinal membrane, and cataracts.[59]  To treat these conditions, Mr. Brunetti uses prescription eye drops and Avastin injections.[60]

Mr. Brunetti also suffers from a number of other ailments, including non-obstructive coronary artery disease, hypertension, left-sided decreased vision following a 2016 stroke, lingering complications in his right hand following several surgeries, and pre-ventricular contractions (a heart condition).[61] Mr. Brunetti also has a history of kidney stones.[62]

Mr. Brunetti does not tell us how we would manage these health conditions upon release. Mr. Brunetti intends to move in with his half-brother, Frank Marche Jr., who resides in Cherry Hill, New Jersey.[63]  But Mr. Brunetti only states Mr. Marche would "help [him] financially so [Mr. Brunetti] can get on his feet and provide [Mr. Brunetti] with a safe environment" without mentioning how they would address his medical conditions.[64]

Mr. Brunetti refers to a risk of COVID-19 at his prison. COVID-19 is a respiratory disease spreading through droplets produced when infectious persons talk, cough, or sneeze.[65]  The virus spreads "easily and sustainably through the community" in affected areas.[66]   COVID-19, which has now spread throughout the world, poses a serious global public health risk.  As of July 30, 2020, the Centers for Disease Control and Prevention reported a total of 4,339,997 cases of COVID-19 in the United States with 148,866 total deaths caused by the virus.[67]  According to the CDC, people of any age with the following conditions might be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); smoking; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[68]

The CDC also identifies age as a significant risk factor. It states "[a]mong adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk."[69]  The CDC reports eight out of ten COVID-19 deaths reported in the United States have been adults sixty-five-years-old and older.[70]

Correctional detention centers "present a unique challenge" for controlling the spread of COVID-19 through prison personnel and staff.[71] As of July 30, 2020, the Bureau of Prisons reported there are 4,049 federal inmates and staff who have confirmed positive test results for COVID-19 nationwide.[72]  There have been 103 federal inmate deaths and one BOP staff member death attributed to COVID-19.[73]

FCI-Fort Dix houses 2,697 inmates; 2,503 of these inmates are housed inmates at the "facility" and 173 of the inmates are housed at the "camp."[74]  As of July 29, 2020, BOP represents there are two active COVID-19 cases at FCI-Fort Dix.[75]   BOP does not specify if these cases are in the "facility" or the "camp."[76]   Since the outbreak began, BOP has confirmed thirty-eight COVID-19 cases at FCI-Fort Dix having administered tests to 299 inmates.[77]

## II.     Analysis

Mr. Brunetti argues his variety of illnesses largely brought upon by his advancing age in combination with the risk of COVID-19 at FCI-Fort Dix warrants his compassionate release under 18 U.S.C. § 3582.[78]  He argues advanced age and serious underlying health concerns, combined with the growing coronavirus pandemic, provide an extraordinary and compelling basis for a sentence reduction.[79]  He seeks a sentence reduction of time served with a three year term of supervised release.[80]  The United States opposes Mr. Brunetti's request.[81]

Congress allows us to reduce a sentence through compassionate release if we determine: (1) the incarcerated movant meets administrative exhaustion requirements, (2) "extraordinary and compelling reasons" warrant a reduction, (3) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (4) the applicable sentencing factors under 18 U.S.C. §3553(a) warrant a reduction.[82]  The policy statement referenced by the statute is Section 1B1.13 of the United States Sentencing Guidelines.[83]  The issue we face is whether Mr. Brunetti meets these requirements as of today.

### A.     Mr. Brunetti exhausted his remedies with the Bureau of Prisons.

Since December 2018, incarcerated persons seeking compassionate release authorized by Congress have "two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the [Bureau of Prisons'] decision not to file a motion, or (2) file a motion after 'the lapse

of 30 days from the receipt … of such a request' by the Warden of the defendant's facility, 'whichever is earlier.'"[84]  Mr. Brunetti submitted a request for compassionate release to the Warden of the FCI-Fort Dix on May 7, 2020.[85]  Thirty days have lapsed since the Warden of Mr. Brunetti's facility received the request.  Mr. Brunetti's motion for compassionate release is ripe for review.[86]

**B.    Mr. Brunetti may present "extraordinary and compelling reasons" for his release.**

Mr. Brunetti seeks compassionate release for "extraordinary and compelling reasons" as provided in the First Step Act, 18 U.S.C. § 3582(c)(1)(A).[87]  Congress provides a mechanism for us to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ."[88]  Section 1B1.13 provides "extraordinary and compelling reasons exist under any of the circumstances set forth below":

(A) **Medical Condition of the Defendant.**—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
(ii) The defendant is—
(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,
that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant.** —The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) **Family Circumstances.**—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) **Other Reasons.**—As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[89]

Mr. Brunetti does not meet the criteria of either the Medical Condition Note or the Family Circumstances Note. Mr. Brunetti is not suffering from a terminal illness, nor do his ailments "substantially diminish" his present ability to provide self-care. Under the Family Circumstances Note, we have no evidence Mr. Brunetti needs to provide care to a family member.

Mr. Brunetti is left to meet "extraordinary and compelling" circumstances by looking to the two remaining Notes—the Age of Defendant and Other Reasons. Under the Age of Defendant Note, Mr. Brunetti must show three elements—advanced age, a significant amount of time served, and a serious deterioration to his physical or mental health because of the aging process. Mr. Brunetti easily satisfies these first two requirements. He is now seventy-three, so he meets the sixty-five-year-old threshold. And Mr. Brunetti has served at least ten years of his sentence, so he meets the service time threshold.

Whether Mr. Brunetti meets the third requirement—"experiencing a serious deterioration in physical or mental health because of the aging process"—requires closer inspection. In *United States v. Ebbers*, Judge Caproni explained this analysis is "fact-sensitive; but comparing the two notes [the Medical Condition Note and Age of Defendant Note] reveals that a defendant need not have lost all ability to provide self-care or be suffering from a terminal illness to qualify for relief under the Age of Defendant Note."[90] But Judge Caproni emphasized the medical condition—even if not required to be "terminal" or disabling—must still be "serious."[91] Judge Caproni summarized

the Age of Defendant Note as applying "to senior citizen defendants who have already spent over ten years in prison and whose physical and cognitive deterioration has impaired basic human functions without regard to whether their conditions, other than aging, are terminal."[92]

We survey some of the health conditions cited by movants seeking release under the Age of Defendant Note.  In *Ebbers*, Judge Caproni described the movant as "sick, weak, disoriented, and bedridden" when concluding the defendant presented sufficiently "serious" deterioration of physical health.[93]  In *United States v. Plunk*, Judge Burgess explained the movant presented many conditions including worn-down cartilage around his joints, lower back pain due to moderate to severe deterioration of his lumbar spinal discs, arthritis in his wrists and hands, high blood pressure, a swollen prostate, age related eyesight and hearing loss, and post herpetic neuralgia.[94]  Judge Burgess concluded the movant, under the Age of Defendant Note, met "the requisite medical conditions for release."[95]  In *United States v. Young*, Judge Trauger concluded a movant suffering from diabetes, high cholesterol, high blood pressure, chronic kidney disease, and cataracts "undoubtedly" met the "serious" medical condition element.[96]

Mr. Brunetti's conditions are not as severe as *Ebbers* or *Young* but resemble *Plunk*.  Mr. Brunetti has a history of thymoma in his chest.[97]  He received a 2018 surgery to remove thymoma nodules in his chest but has experienced persistent pain on the incision site for the past eighteen months and still feels frequent shortness of breath.[98]  Mr. Brunetti also suffers from serious eye conditions, including hypertensive retinopathy, branch retinal vein occlusion, epiretinal membrane, and cataracts.[99]  To treat these conditions, Mr. Brunetti uses prescription eye drops and Avastin injections.[100]  Mr. Brunetti also has coronary artery disease and a heightened risk for cardiovascular accident or stroke. These issues to his physical health can each fairly be said to be caused by the aging process.

11

His medical condition may present extraordinary and compelling reasons. We are mindful of Mr. Brunetti's heightened risk. But we need not specifically conclude whether Mr. Brunetti's many health conditions rise to the level of "serious deterioration" in physical health under the Age of Defendant Note. We also need not determine whether, under the Other Reasons Note, Mr. Brunetti's age and health conditions during the COVID-19 pandemic present an extraordinary and compelling reason. Because even if we presume Mr. Brunetti meets the extraordinary and compelling threshold, he fails to convince us he warrants a sentence reduction for other reasons Congress requires us to consider.

### C.    We deny Mr. Brunetti's motion as he is a danger and release is not consistent with Congress's sentencing factors.

Even if we found Mr. Brunetti presents an "extraordinary and compelling" reason for a sentence reduction based on his health and age, Congress requires before we reduce a sentence for compassionate release we also (1) consider whether he presents "a danger to the safety of any other person or to the community"; and, (2) apply the section 3553(a) sentencing factors.[101] Under both of these standards, Mr. Brunetti fails to show he warrants a sentence reduction.

### 1.    Mr. Brunetti remains a danger to the community based on the present record.

The Sentencing Commission's policy statement, while not binding, nonetheless offers helpful guidance and provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[102] Section 3142(g) sets out factors we must consider when deciding whether to release a defendant pending trial.[103] These factors include: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence" or "involves a...firearm"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the

person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[104]

We weigh these factors as to Mr. Brunetti.  We first look to the nature and circumstances of the offense charged.  Mr. Brunetti is serving a forty-year sentence for his role in a brutal and violent organized criminal enterprise.  The Enterprise hired Mr. Brunetti to assemble bombs.  And from the start, the Enterprise's "hit crew," Mr. Brunetti included, met to concoct detailed plans to murder Merlino and his followers.  To carry out the plans, Mr. Brunetti assembled bombs, collected cyanide, and scouted Merlino members on video.  He sported rifles on Philadelphia streets and highways to carry out murder plots against Merlino and his members.

Mr. Brunetti attempts to downplay his role.  He states he "was the only one defendant in the [presentence report] as NOT BEING CONNECTED TO ANY MURDER OR GETTING A MURDER INDICTMENT."[105]   It appears Mr. Brunetti believes he can wipe his hands clean because he did not pull the trigger.  Mr. Brunetti's account is troubling.  Mr. Brunetti ignores his deep involvement in the conspiracy to murder several members of the Merlino faction.  Mr. Brunetti set out to murder on multiple occasions but either did not have the shot or the shot was too risky to take.  In the shooting of Merlino and his associate Michael Ciancaglini, Mr. Brunetti undoubtedly played a key role even if not physically present at the time of the shooting.

Mr. Brunetti's role in these serious offenses unfortunately appears consistent with his behavior before the charged conduct.  Courts earlier twice convicted Mr. Brunetti of assault, including a 1984 incident where he significantly assaulted his ex-wife after breaking into her home. He does not address this worrying incident at all.  Another ex-wife referred to him as violent and incapable of changing.

We independently inspect the record and see Mr. Brunetti has a history of drug and alcohol abuse. But Mr. Brunetti does not address this history. Nor do we seeing him pointing to meaningful connections to family members. He does not refer to his children.[106] He does not even offer much about his half-brother, Frank Marche, who is willing to offer Mr. Brunetti into his home if released.

It is true, as Mr. Brunetti points out, the criminal events transpired over twenty-five years ago. We are mindful we evaluate Mr. Brunetti's risk as of today. Since these events, Mr. Brunetti claims significant rehabilitation during his incarceration. He cites to and we acknowledge his participation in some productive programs and seminars. And Mr. Brunetti is right his recent conduct while incarcerated shows generally good behavior. But Mr. Brunetti overlooks his 2000 infraction for possessing a weapon. While this event took place twenty-years ago, it remains significant as demonstrating Mr. Brunetti's violent tendencies potentially stuck with him through sentencing and into his time in prison.

Mr. Brunetti cites studies supporting his age "places him in the class of prisoners least likely to recidivate."[107] But even this study appreciates 13.4% of offenders age sixty-five or older are rearrested.[108] We applaud Mr. Brunetti's recent good behavior and participation in productive programming. We appreciate his age and the studies tending to show his likelihood of recidivism if released.

But these positives do not nearly counterbalance the negatives. Mr. Brunetti's offenses are serious and violent. His history before these offenses reveal more violent behavior. He does not point to family support or positive activities which could provide assurances of his accountability upon his release. We see limited evidence in the record specific to Mr. Brunetti allowing us to conclude he would safely reenter the community. We must conclude, on the present record, Mr. Brunetti remains a danger to the community.

### 2.    We decline to reduce Mr. Brunetti's sentence after applying the sentencing factors.

As our Court of Appeals reminded us last week in affirming the denial of compassionate release to a far less violent person in *United States v. Pawlowski*,[109] Congress requires we "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."[110] "Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here."[111] The applicable factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][112]

In *Pawlowski*, our Court of Appeals also noted: "Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors."[113] In *Pawlowski*, our Court of Appeals affirmed our colleague Chief Judge Sanchez's denial of the compassionate release of a public official with a health condition rendering the official susceptible of serious injury should he contract COVID-19 because the official's crimes required "a significant period of incarceration" due to the severity and "abuse[s] [of] a position of public trust."[114]

15

Mr. Brunetti is not eligible for resentencing under section 3553. Mr. Brunetti's crimes are serious. He willingly participated in organized crime. He assembled bombs and scoped out rivals with hopes to kill them. His characteristics before these crimes similarly show a violent personality. A court convicted him for severely beating his ex-wife. While we see some progress in Mr. Brunetti's behavior, we still must protect the public from further crimes. We also consider the seriousness of the offense and are not persuaded an early release for these crimes would provide respect for the law. Because there is a need to continue the sentence imposed against Mr. Brunetti, releasing Mr. Brunetti now would not be a sufficient sentence to comply with the purposes of sentencing identified by Congress in 3553(a).

## III.    Conclusion

Although Mr. Brunetti is understandably concerned with contracting COVID-19 while incarcerated given his health conditions as he ages, we cannot grant his request for compassionate release as he remains a danger to the community and fails to show he has served a sufficiently lengthy sentence to comply with the purposes of sentencing policy.

---

[1] We review the record in the ECF document system and Mr. Brunetti's Presentence Investigation Report ("PSR").

[2] PSR ¶ 306.

[3] *Id.* ¶ 307.

[4] *Id.*

[5] *Id.*

[6] *Id.* ¶¶ 313-314.

[7] *Id.* ¶ 313.

[8] *Id.*

[9] *Id.*

[10] *Id.* ¶ 314.

[11] *Id.* ¶ 317.

[12] *Id.*

[13] *Id.* ¶ 318.

[14] *Id.* ¶ 309.

[15] *Id.*

[16] *Id.* ¶ 310.

[17] *Id.* ¶ 311.

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶ 299.

[21] *Id.* ¶ 300.

[22] *Id.*

[23] *Id.* ¶ 9.

[24] *Id.* ¶ 19.

[25] *Id.* ¶ 10-12.

[26] *Id.* ¶ 12.

[27] *Id.* ¶ 22.

[28] *Id.* ¶ 24.

[29] *Id.*

[30] *Id.* ¶ 28.

[31] *Id.* ¶ 25.

[32] *Id.*

[33] *Id.* ¶ 28.

[34] *Id.*

[35] *Id.*

[36] *Id.* ¶ 33.

[37] *Id.* ¶ 59.

[38] *Id.* ¶ 60.

[39] *Id.*

[40] *Id.* ¶ 64

[41] *Id..*

[42] *Id.*

[43] *Id.* ¶ 35

[44] *Id.* ¶¶ 36-38.

[45] *Id.* ¶ 46.

[46] *Id.* p. 1.

[47] ECF. Doc. No. 807.

[48] *Id.*

[49] ECF Doc. No. 1319.

[50] ECF Doc. No. 1634.

[51] ECF. Doc. No. 1980 at 2.

[52] ECF. Doc. No. 1983 at 4.

[53] ECF. Doc. No. 1976 at 1.

[54] ECF. Doc. No. 1983 at 4.  The United States includes in its briefing an account of Mr. Brunetti's disciplinary history. While it does not attach the disciplinary records as an exhibit, Mr. Brunetti

does not contest the validity of the United States's account. *See* ECF Doc. No. 1989 (contesting the severity of infractions but admitting the infractions took place).

[55] *Id.* at 4-5.

[56] ECF Doc. No. 1976 at 1.

[57] ECF Doc. No. 1984 at 37. Thymomas tumors that form on the thymus gland in the chest which can either be cancerous or non-cancerous.

[58] *Id.*

[59] *Id.* at 15.

[60] *Id.*

[61] *Id.* at 15, 37, 54, 77, 99, 137, 193-94.

[62] *Id.* at 77.

[63] ECF Doc. No. 1976 at 13.

[64] *Id.*

[65] Centers for Disease Control and Prevention, *Coronavirus 2019 Basics*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fprepare%2Ffaq.html#Spread (last visited July 30, 2020).

[66] *Id.*

[67] Centers for Disease Control and Prevention, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 30, 2020).

[68] Centers for Disease Control and Prevention, *People Who Need Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 30, 2020).

[69] Centers for Disease Control and Prevention, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited July 29, 2020).

[70] *Id.*

[71] Centers for Disease Control and Prevention, *Guidance for Correctional Detention*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 30, 2020).

[72] Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/index.jsp (last visited July 28, 2020).

[73] *Id.*

[74] Federal Bureau of Prisons, *FCI-Fort Dix*,  www.bop.gov/locations/institutions/ftd (last visited July 30, 2020).

[75] Federal Bureau of Prisons, *FCI-Fort Dix, Confirmed Active Cases*, www.bop.gov/coronavirus (last visited July 30, 2020).

[76] *Id.*

[77] *Id.*

[78] ECF Doc. No. 1976 at 1. Congress repealed the compassionate release provision under 18 U.S.C. § 4205(g) in November 1987 and instructs us to apply 18 U.S.C. § 3582 for incarcerated persons whose offenses occurred after that date.

[79] ECF Doc. No. 1989 at 1.

[80] *Id.*

[81] ECF Doc. No. 1983.

[82] 18 U.S.C. § 3582(c)(1)(A)(i).

[83] U.S.S.G. § 1B1.13.

[84] *U.S. v. Rodriguez*, --- F. Supp. 3d ----, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020)  (citing 18 U.S.C. § 3852(c)(1)(A)).

[85] ECF Doc. No. 1983 at 5.

[86] *See* 18 U.S.C. § 3582(c)(1)(A) (courts can consider motions for compassionate release after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility").

[87] ECF Doc. No. 1989.

[88] 18 U.S.C. § 3582(c)(1)(A)(i).

[89] U.S.S.G. § 1B1.13.

[90] *U.S. v. Ebbers*, 432 F. Supp. 3d 421, 428 (S.D.N.Y. 2020).

[91] *Id.*

[92] *Id.*

[93] *Id.* at 432.

[94] *U.S. v. Plunk*, No. 94-036, 2020 WL 3582902, at *2 (D. Alaska Apr. 9, 2020).

[95] *Id.* at *4.

[96] *United States v. Young*, No. 00-2-1, 2020 WL 1047815, at *8 (M.D. Tenn. Mar. 4, 2020).

[97] ECF Doc. No. 1984 at 37.

[98] *Id.*

[99] *Id.* at 15.

[100] *Id.*

[101] 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13.

[102] *U.S. v. Clausen*, No. 00-291-2, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020) (citing *Rodriguez*, 2020 WL 1627331, at *11 (quoting U.S.S.G. § 1B1.13(2))).

[103] *Id.*

[104] *Id.* (citing 18 U.S.C. § 3142(g)(1)–(4)).

[105] ECF Doc. No. 1980 at 2-3.  In a counselled brief following this *pro se* submission, the Federal Defender stated Mr. Brunetti "does not minimize the severity of his prior criminal activity nor the seriousness of the illegal conduct for which he was convicted." ECF Doc. No. 1989 at 20.

[106] We did receive a letter from a woman by the name of "Rebecca Fairorth (Brunetti)" representing herself to be Mr. Brunetti's daughter. ECF Doc. No. 1991. We do not see a mention to a daughter named Rebecca in Mr. Brunetti's PSR, but we gather Ms. Fairorth is possibly the ex-wife of one of Mr. Brunetti's sons.

[107] ECF Doc. No. 1989 (citing United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (December 2017)).

[108] *The Effects of Aging on Recidivism Among Federal Offenders*, *supra* at 3.

[109] *U.S. v. Pawlowski*, No. 20-2033, slip op. at 5-6 (3d Cir. July 24, 2020).

[110] 18 U.S.C. § 3582(c)(1)(A).

[111] *Rodriguez*, 2020 WL 1627331, at *6.

[112] 18 U.S.C. § 3553(a).

[113] *Pawlowski*, slip op. at 8.

[114] *Pawlowski*, slip op. at 8-9.