**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.  94-127-13 |
| | : | |
| SALVATORE BRUNETTI | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                              **March 8, 2022**

     Federal Judges do not serve as parole boards under federal sentencing policy. A judge's final sentence does not set a minimum or maximum term of incarceration. A judge thoughtfully arrives at a specific sentence after considering several factors, including those provided by Congress and the Sentencing Commission, to ensure a sentence is sufficient but not greater than necessary mindful of the convicted person's background and rehabilitation. We do not modify sentences years later just because the incarcerated person has shown significant progress towards rehabilitation while incarcerated. We may, however, modify the terms of incarceration and allow an early release date if the incarcerated person demonstrates extraordinary and compelling reasons to deviate from federal sentencing policy including meeting Congress's sentencing factors in a later look at a sentence. We today address a former bomb maker for the Philadelphia La Cosa Nostra who seeks early release based on his demonstrated good conduct and citing recent cardiac concerns. Judge Buckwalter sentenced this man convicted of conspiring to murder many organized crime associates to forty years' incarceration. We recognize and credit the man's efforts while incarcerated and appreciate his age and present medical struggles offer a good faith basis to seek review of his present sentence. But his age and controllable cardiac conditions are not extraordinary or compelling reasons to modify Judge Buckwalter's sentence. Nor is his

demonstrated rehabilitation grounds and internal evaluations of lower risk of violence alone to overrule Judge Buckwalter's findings as to a sentence sufficient to deter criminal conduct and promote respect for the law arising from the man's violent criminal conduct designed to murder several rivals at the behest of the La Cosa Nostra boss. We deny a second motion for compassionate release.

## I.  Background

In his mid-forties, Salvatore Brunetti joined Philadelphia's La Cosa Nostra Enterprise led by John Stanfa ("the Enterprise") to plan and effect murders based on his expertise in making bombs. The Enterprise operated with a sophisticated and organized hierarchy under boss John Stanfa. Philadelphian Joseph Merlino ran a competing organized criminal enterprise.[1] Tensions between the Enterprise and the Merlino faction escalated when someone shot Enterprise underboss Joseph Ciancaglini on March 2, 1993.[2] The Enterprise responded by recruiting members as "hit crews" against Mr. Merlino's associates.[3]

The Enterprise brought in Mr. Brunetti to help murder twelve of Mr. Merlino's associates because of "his expertise with making bombs."[4] The Enterprise trusted Mr. Brunetti because Mr. Brunetti had done "work" before—*i.e.*, murdered people.[5] Mr. Brunetti directed the purchase of gunpowder for use in making bombs, and participated in building, testing, and attempting to detonate pipe bombs.[6] Mr. Brunetti also provided cyanide to kill rival boss Merlino, and tried to recruit a woman to place cyanide in Mr. Merlino's drink.[7] Mr. Brunetti also viewed videotape footage of Mr. Merlino and his associates attending a wake so he could identify the twelve targets to be murdered, and Mr. Brunetti shared this videotape and photographs with his fellow hitmen so they knew whom to murder.[8]

From August 1 through August 4, 1993, Mr. Brunetti and other Enterprise members tried to kill Mr. Merlino several times.[9] They carried guns, including a high-powered rifle with a scope, and a homemade bomb, which they intended to place under Mr. Merlino's car.[10] One attempt involved a plan to shoot Mr. Merlino with a rifle from the side of the I-95 interstate highway which overlooked Mr. Merlino's residence.[11] Another attempt involved Mr. Brunetti following Mr. Merlino to a funeral home planning to shoot him before aborting the attempt because there were too many people nearby.[12]

On August 5, 1993, Mr. Brunetti and four others agreed to murder a known associate of Mr. Merlino.[13] They drove in two cars to the area of 28th Street and Gray's Ferry Avenue.[14] The men planned for Mr. Brunetti to drive the getaway car but called off the attempt after seeing police in the area.[15] After this attempt failed, two Enterprise members dropped off Mr. Brunetti at his home and then returned to Mr. Merlino's "clubhouse."[16] The Enterprise members shot Mr. Merlino and killed his associate Michael Ciancaglini.[17] Mr. Stanfa paid Mr. Brunetti for his murderous conduct.[18]

### Mr. Brunetti's conviction and present sentence.

Mr. Brunetti entered custody after a March 18, 1994 arrest.[19] Our grand jury returned a second superseding indictment in June 1995 charging then-forty-six-year-old Mr. Brunetti and seventeen other members of the Enterprise, including Mr. Stanfa, for engaging in organized crime under the Racketeer Influenced and Corrupt Organization Act.[20] Our grand jury specifically charged Mr. Brunetti in the first two of thirteen counts for his roles in the attempted murder of rival boss Mr. Merlino, the conspiracy to murder twelve members of Mr. Merlino's group, and the attempted murder of Mr. Merlino associate Steve Mazzone.[21]

A jury found Mr. Brunetti guilty in May 1996 of attempted murder and conspiracy to murder members of a rival organized crime enterprise. Mr. Brunetti's role in the enterprise included his bomb-making expertise used in attempts to murder Mr. Merlino, Mr. Mazzone, and conspiracy to murder twelve other members of the Merlino enterprise.[22] Judge Buckwalter sentenced Mr. Brunetti on May 8, 1997 to forty years' imprisonment—two consecutive twenty-year terms—with a three-year term of supervised release.

### We denied Mr. Brunetti's first motion for release in July 2020.

Mr. Brunetti first sought compassionate release in May 2020, arguing his age and medical conditions put him at high risk for complications from COVID-19.[23] After considering the briefing, including Mr. Brunetti's counseled reply brief, we denied Mr. Brunetti's Motion for compassionate release on July 31, 2020.[24] We thoroughly detailed Mr. Brunetti's background, documented history of mental illness and substance abuse, military records, employment history, marital history, his role in an organized crime enterprise leading to his conviction and sentence, disciplinary history and health in prison, medical records, and the then-current COVID-19 data from the Centers for Disease Control and Prevention.[25] We concluded while Mr. Brunetti's age-related deterioration in his physical health may possibly demonstrate extraordinary and compelling reasons for release, he remains a danger to the community and the applicable sentencing factors did not warrant a reduction in sentence. We later denied Mr. Brunetti's reconsideration request.[26]

### Mr. Brunetti again moves for compassionate release.

Mr. Brunetti now tries again. He argues his already documented history of hypertension and hyperlipidemia, heart disease and arteriosclerosis, liver disease, hepatitis C, and history of smoking have caused a further deterioration in his medical condition substantially diminishing his

ability to provide self-care in prison.[27] He seeks a reduction of sentence to time served and immediate release.

Mr. Brunetti is vaccinated against COVID-19.[28] He had a COVID-19 infection in early 2021 but did not require hospitalization.[29] Cardiologist Mark Soffer, M.D. examined Mr. Brunetti on November 22, 2021.[30] Dr. Soffer noted Mr. Brunetti's history of "hypertension, hyperlipidemia, nonobstructive coronary artery disease, nonobstructive carotid disease, nonobstructive peripheral vascular disease, remote stroke of uncertain etiology, and a surgically removed mediastinal mass."[31] Dr. Soffer noted Mr. Brunetti's blood pressure "has been poorly controlled with systolics as high as 200, most recently in the 160s to 170s" and poorly controlled hyperlipidemia.[32] Dr. Soffer recommended a change in medications, including to treat high blood pressure, and advised a return to the clinic for symptoms or difficulty controlling blood pressure.[33] Dr. Soffer advised Mr. Brunetti return to telemedicine clinic in one year or sooner for symptoms or if he faced difficulty in controlling his blood pressure.[34] On November 30, 2021, Mr. Brunetti went to the prison's Health Services complaining of "feeling different" after starting a new medication. At that time, the medical professionals reported his blood pressure at 147/70.[35]

After receiving the third dose of the COVID-19 vaccine in December 2021, Mr. Brunetti reported having an "allergic event" to the vaccine and experienced chest and left shoulder and arm pain.[36] Mr. Brunetti went to a hospital where he underwent a nuclear stress test revealing a peri-infarct ischemia[37] in the inferior and inferolateral walls of the heart.[38] Mr. Brunetti then underwent a cardiac catheterization revealing obstructive coronary artery disease of the right coronary artery.[39] At hospital discharge, the medical plan included "aggressive medical management for obstructive coronary artery disease and its associated risk factors," an increase in medication, and follow-up with a cardiologist after discharge.[40] Upon discharge from the hospital and return to FCI

Fort Dix, a clinical encounter note on December 10, 2021 shows Mr. Brunetti with a blood pressure of 115/64.[41] The most recent note in his medical record, dated January 25, 2022, shows a renewal of his medications.[42]

Mr. Brunetti reminds us he will reside rent-free with his younger brother Frank Marche in Cherry Hill, New Jersey; he will collect social security benefits; Medicare and United States military benefits will cover his medical care; family and friends in New Jersey will assist in his transition back into the community; and he will continue teaching Fine Arts and Music (as he has done in the Bureau of Prisons), sell his artwork either through private clients or galleries, and work as an independent jeweler for which he has been trained.[43]

FCI Fort Dix today reports three inmate and one staff active cases of COVID-19.[44] The Centers for Disease Control and Prevention reports 77.6% of the eligible population of Burlington County, New Jersey (where FCI Fort Dix is located) is vaccinated and there is a 2.72% positivity rate for the period February 26 to March 4, 2022.[45] Community transmission is considered "substantial" in Burlington County for the period February 28 to March 6, 2022.[46] The seven-day percent change in positive testing is down 1.51% and new hospital admissions are down 26.80% in the last seven days.[47] Older adults (those age sixty-five and older) continue to be at the highest risk of becoming very sick from COVID-19, a person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases, and those with medical conditions such as heart disease, including coronary artery disease, and hypertension are at high risk for severe illness from COVID-19.[48]

Mr. Brunetti also presents new evidence regarding the unlikelihood of further criminal conduct upon release. Mr. Brunetti offers (1) the Bureau of Prison's recidivism assessment tool, Prison Assessment Tool Targeting Estimated Risk Needs ("PATTERN") report from June 15,

2021;[49] (2) a January 24, 2022 "Positive Decision Report" from the Supervisory Chaplin at FCI Fort Dix;[50] and (3) a notarized statement from his ex-wife denying she ever called Mr. Brunetti "a dangerous individual who was incapable of change" as reported in the pre-sentence report relied upon by Judge Buckwalter without objection to this language.[51]

## II.  Analysis

Mr. Brunetti conspired to murder competing organized crime associates. Mr. Brunetti again seeks compassionate release. Congress allows we "may reduce the term of imprisonment" and "impose a term of probation or supervised release with or without conditions" if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," we find "extraordinary and compelling reasons warrant such a reduction."[52] We may consider the Sentencing Guidelines to determine whether a petitioner presents "extraordinary and compelling reasons" to warrant a reduction in sentence.

Several courts of appeals and colleagues have now had the benefit of studying compassionate release in light of COVID-19 health concerns. We are particularly mindful of the decision from our Court of Appeals in *United States v. Andrews*[53] issued after we denied Mr. Brunetti's first motion for compassionate release. In *Andrews*, our Court of Appeals held the Sentencing Commission's policy statement at U.S.S.G. § 1B1.13 describing "extraordinary and compelling reasons" under section 3592(c)(1)(A)(i) is not applicable and is not binding on district courts when considering prisoner-initiated (rather than Bureau of Prisons-initiated) motions for compassionate release.[54] While the Sentencing Commission's policy statement is no longer binding, our Court of Appeals directs "it still sheds light on the meaning of extraordinary and compelling reasons" and we may use it to guide our discretion in considering compassionate release.[55]

While we are not bound today by the policy statement following *Andrews*, we may consider the Sentencing Commission's "extraordinary and compelling reasons" based on Mr. Brunetti's medical condition and age:[56]

> (A) **Medical Condition of the Defendant.**—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> > (I) suffering from a serious physical or medical condition,
> > (II) suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) **Age of the Defendant. —**The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

Mr. Brunetti and the United States largely dispute whether his medical condition today meets either the Medical Condition or Age Note. We find neither Note warrants a finding of extraordinary and compelling reasons for release based on the adduced medical records. But we are not medical professionals. We also find, even if Mr. Brunetti's coronary developments could be fairly characterized as a "serious deterioration" in his physical health, we cannot grant compassionate release consistent with the section 3553 sentencing factors. We deny Mr. Brunetti's motion for compassionate release.

### A. Mr. Brunetti's age-related deteriorating health are grounds for "extraordinary and compelling reasons."[57]

Mr. Brunetti argues he meets both the Medical Condition Note and Age Note for extraordinary and compelling reasons. He presents the same medical records from 2019 to 2020 we found did not meet the Medical Condition Note in denying his first motion for compassionate release.[58] We also have new medical records from 2021 to early 2022 from the Bureau of Prisons.[59] The United States responds Mr. Brunetti fails to meet either the Medical Condition Note or Age Note, arguing the recent medical records do not show Mr. Brunetti suffers from any condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" *or* that he is "experiencing a serious deterioration in physical or mental health."[60]

### 1. Mr. Brunetti does not meet the Medical Condition Note.

Mr. Brunetti contends his ongoing medical conditions, now exacerbated by uncontrolled hypertension and a recent cardiac catheterization revealing obstructive coronary artery disease, restrict his ability for self-care within the prison environment; his "need for a proper diet [is] not available through the [Bureau of Prisons]"; and his high risk for serious complications from COVID-19 constitute extraordinary and compelling reasons under the Medical Condition Note for reduction in sentence.[61] He contends his age and medical conditions continue to put him at high risk for COVID-19, particularly with the Omicron variant infecting those already vaccinated.

Recent medical records show some change in Mr. Brunetti's heart condition. On November 22, 2021, cardiologist Dr. Soffer noted Mr. Brunetti's poorly controlled hypertension and hyperlipidemia. In December 2021, Mr. Brunetti underwent a cardiac catheterization after experiencing chest pain revealing obstructive coronary artery disease to be treated with aggressive

9

medical management. Mr. Brunetti claims his current medical conditions cause him to suffer diminished capacity restricting some of his self-care in prison, specifically his need for a proper diet not available through the Bureau of Prisons.[62] Mr. Brunetti contends his poorly controlled blood pressure, as noted by Dr. Soffer in November 2021, remains uncontrolled causing his inability for self-care,  including his inability "to walk without dizziness, falling, or passing out wherever he is/was."[63] He attaches his blood pressure readings from December 1, 2020 to January 6, 2022 showing readings as low as 117/71 on January 4, 2021 and as high as 200/91 on September 13, 2021 with wide fluctuations in readings.[64] Two-and-a-half weeks after Dr. Soffer's consultation, Mr. Brunetti underwent cardiac catheterization revealing obstructive coronary artery disease.[65] Mr. Brunetti claims not only is there a threat of an adverse result from a COVID-19 infection, but there is a lack of medical care at FCI Fort Dix and, if a medical emergency arises, response of medical staff "would drastically endanger [his] chances of survival."[66]

There is nothing in the record, beside his subjective reporting, indicating Mr. Brunetti's medical conditions prevent him from providing "self-care within the environment of a correctional facility."[67] The records show fluctuating and high blood pressure readings. But there is nothing in the record to support Mr. Brunetti's claim there is lack of adequate medical care at FCI Fort Dix. To the contrary, the record contains over 200 pages of medical records from his first motion for compassionate release from 2019 to 2020 and over 300 pages of medical records from 2021 to early 2022.[68] Mr. Brunetti has access to medical care. His medical conditions are being treated with medication. With regard to COVID-19, Mr. Brunetti is fully vaccinated and had an earlier infection from which he recovered. Our Court of Appeals recently found "'widespread availability of the COVID-19 vaccine … eliminates' need for compassionate release."[69] The Omicron variant does not change the calculus.[70] The Centers for Disease Control and Prevention ("CDC") reports

those sixty-five and older who received two doses of the vaccine showed a 94% reduced risk of COVID-19-related hospitalization.[71] We find nothing to support Mr. Brunetti's claim his medical conditions "substantially diminish[] [his] ability to provide self-care within the environment of [FCI Fort Dix]."[72] His medical condition today does not constitute extraordinary and compelling reasons justifying compassionate release.

## 2.   Mr. Brunetti has not shown serious deterioration of his health.

We found Mr. Brunetti's health conditions in July 2020 may satisfy the second requirement of the Age Note: "experiencing a serious deterioration in physical or mental health because of the aging process."[73] We found Mr. Brunetti's medical conditions, including coronary artery disease and a heightened risk for cardiovascular incident  or stroke, can each fairly be said to be caused by the aging process and may present extraordinary and compelling reasons. We recognized Mr. Brunetti's medical conditions in July 2020 which could fairly be said to be caused by the aging process. We did not base our decision on his medical condition; we instead found no basis for release under the section 3553 factors.

We have a different view today. Mr. Brunetti's medical condition appears to have changed over the last eighteen months.  Dr. Soffer found poorly controlled hypertension and hyperlipidemia and a cardiac catheterization revealing obstructive coronary artery disease. But we have no evidence of a serious deterioration in Mr. Brunetti's health. He, like many older persons in custody, faces challenges in his heart health. COVID-19 does not appear to pose the same risk today as in July 2020. Mr. Brunetti is receiving medication. His most recent records confirm the medication is working.

We cannot find Mr. Brunetti is facing a serious deterioration of his physical health. We decline compassionate release.

11

**B.  We also decline to reduce the sentence after applying the section 3553(a) factors**.

We find Mr. Brunetti has not shown a serious deterioration in health which may counsel in favor of finding extraordinary and compelling reasons for compassionate release. We need not evaluate whether release is consistent with Congress's sentencing factors. But we must be mindful we are not medical professionals and would be foolish to base our analysis solely on our view of whether Mr. Brunetti's fluctuating condition could be a "serious" deterioration of health based on conflicting medical records.[74]

We denied Mr. Brunetti's first motion for compassionate release in July 2020 after finding he remains a danger to the community and the relevant section 3553(a) sentencing factors weighed against his release.[75] While we today find no extraordinary or compelling reason for release based on either the Medical or Age Notes offered by the Sentencing Commission, we also find the sentencing factors again weigh against release.

Mr. Brunetti argues our consideration of the section 3553(a) sentencing factors require us to consider his disparate sentence under today's Sentencing Guidelines, his strong family ties, and his minimal risk of recidivism.[76] Mr. Brunetti argues he completed 81% of his statutory term, 70% of his full term, and earned good credit time; completed 105 educational courses with special focus on the intense behavioral and psychology courses "to help him change his criminal thinking process and also aid his ability to fully integrate with society with a normal and calm mind-set"; and completed the "CODE" behavioral program.[77]

Mr. Brunetti offers three new pieces of information for our consideration we did not have when we denied his first motion for compassionate release: (1) the Bureau of Prison's recidivism assessment tool, Prison Assessment Tool Targeting Estimated Risk Needs ("PATTERN") report from June 15, 2021;[78] (2) a January 24, 2022 "Positive Decision Report" from the Supervisory

Chaplin at FCI Fort Dix;[79] and (3) a notarized statement from his ex-wife denying she ever called Mr. Brunetti "a dangerous individual who was incapable of change."[80] We address each in turn before finding they do not change our view concerning the seriousness of the offense and an early release would not support respect for the law.

### 1. The PATTERN assessment does not alter our concerns with early release.

Mr. Brunetti offers a June 15, 2021 Bureau of Prison PATTERN risk assessment of "minimum" in overall risk and violent risk level.[81] Mr. Brunetti argues this assessment, combined with his advanced age as a main predictor of the declining risk of violence, demonstrates his risk to society is non-existent.[82] He contends the PATTERN assessment shows he is not a danger to society which he views as the critical factor leading to our denial of his first motion for compassionate release.

The First Step Act requires the Attorney General to, among other responsibilities, to "conduct a review of the existing prisoner risk and needs assessment system in operation,"; "develop recommendations regarding evidence-based recidivism reduction programs and productive activities,"; "conduct ongoing research and data analysis on" evidence-based recidivism reduction programs; and "on an annual basis, review, validate, and release publicly on the Department of Justice website the risk and needs assessment system, which shall include -- … an evaluation to ensure that the risk and needs assessment system bases the assessment of each prisoner's risk of recidivism on indicators of progress and of regression that are dynamic and that can reasonably be expected to change while in prison" and other benchmarks of risk and needs assessment and recidivism rates.[83] To that end, on July 19, 2019, Attorney General Barr announced a "new Risk and Needs Assessment System called the Prisoner Assessment Tool and Targeting Estimated risk and Needs, or simply 'PATTERN.'"[84]

According to the Department of Justice's National Institute of Justice, PATTERN "is designed to predict the likelihood of general and violent recidivism for all [Bureau of Prison] inmates three years post release. PATTERN contains both static (*e.g.*, criminal history) and dynamic (*e.g.*, participation in education or drug treatment) factors that are associated with one's risk of recidivism. The PATTERN assessment tool provides predictive scores, developed and validated for males and females separately."[85]

The PATTERN tool considers fifteen variables: "age at assessment"; "infraction convictions (any) current incarceration"; "infraction convictions (serious and violent) current incarceration"; "infraction-free (any)"; "infraction-free (serious and violent)"; "program completions"; "work programming"; "drug treatment while incarcerated"; "noncompliance with financial responsibility"; "instant offense violent"; "sex offender"; "criminal history score"; "history of violence"; "history of escapes"; and "education score".[86] Each variable item receives a score or "yes/no" where applicable.[87] A "General Male" score between -23 to 8 and a "Violent Male" score between -11 to 6 are considered a minimum risk level.[88] Mr. Brunetti's PATTERN score is assessed at -6 for "General Male" and 0 for "Violent Male."[89]

At the outset of the COVID-19 pandemic, the Bureau of Prisons began using PATTERN, among other factors, to determine whether at-risk inmates who are non-violent and posed minimal likelihood of recidivism should serve the balance of their sentences in home confinement.[90]  These decisions are left to the Bureau of Prisons which can decide to allow home confinement in light of the COVID-19 risk in our correctional facilities.

Several judges have reviewed PATTERN in the compassionate release context. The judges find the tool may have some effect on our section 3553 analysis but others find a low PATTERN score does not override Congress's sentencing factors including the seriousness of the offense. For

example,  Judge Leeson denied a motion for compassionate release finding the petitioner did not show an extraordinary and compelling reason to warrant a reduction in sentence and petitioner, convicted of drug crimes, remains a danger to the community notwithstanding a PATTERN score of "low."[91] Judge Hornak granted a motion for compassionate release finding petitioner's medical conditions constitute extraordinary and compelling reasons for release and, after considering the section 3553(a) sentencing factors and danger to community, finding petitioner is not a danger to the community considering his non-violent crime, good conduct in prison, and PATTERN score of "low."[92]

We credited Mr. Brunetti's behavior while incarcerated in July 2020. We again today credit his continued efforts in the Bureau's internal reports. We do not suggest the Bureau could not find grounds to release on home confinement when faced with COVID-19 mitigation protocols. The internal evaluations offer promising benchmarks for use by professionals in rehabilitation disciplines. But these internal evaluations do not alter our view as to the seriousness of his offenses found by the jury and the need to promote respect for the law.  Mr. Brunetti conspired to murder several rivals in organized crime. His violent offenses warranted a forty-year sentence to promote respect for the law and deter further organized crime conduct.  We commend his PATTERN score but it is not controlling. While the PATTERN score assists us in appreciating the lower risk to society in release, we are not persuaded the low score erases the violent conduct leading to the sentence.

### 2. We credit but are not persuaded by Chaplain Gates's and Denise Ganci's statements.

Mr. Brunetti argues our review today should account for character statements from Supervisory Chaplain Dr. Kenneth Gates and his former wife Denise Ganci. We studied their

insights. They both report Mr. Brunetti's progress and urge his release. Chaplain Gates reports Mr. Brunetti, through his work as a chapel orderly, "has demonstrated a sincere commitment toward preparing himself for reentry into society"; he "has engaged in meaningful programming that has provided a solid foundation towards his reentry efforts"; he "has taken responsibility for his actions [and] made a personal commitment to being a better human being"; "expressed a desire to redeeming [*sic*] himself by proving that he can contribute positively to society"; and "[w]ith a background in music and art, Mr. Brunetti hopes to inspire youth to make positive decisions with their lives."[93] Chaplain Gates concludes he is "confident that Mr. Brunetti has made the necessary internal decisions which would allow him to enjoy a successful reentry into society."[94]

Denise Ganci is Mr. Brunetti's former wife and the two have a child together. Ms. Ganci represents she and her child know Mr. Brunetti "to be a loving, caring Father" with home they "have stayed in touch over the years." Ms. Ganci denies ever saying she "think[s] Salvatore Brunetti is a dangerous individual who was incapable of change."[95] She contends "it is the opposite," citing Mr. Brunetti's expressions of "regret for what happened 27 years ago and we believe that he has been undergoing change for decades now."[96] She is "confident that he is not a danger to society and we would like him to come home and spend his last remaining years with his family and grandchildren" who "miss[] and love[] him."[97] At the time we considered Mr. Brunetti's first motion for compassionate release, the pre-sentence report contained a representation from Ms. Ganci (then Denise Camp) who described Mr. Brunetti as "a violent person who couldn't change."[98] We now have Ms. Ganci's statement recanting this statement. We have no evidence Mr. Brunetti objected to this statement in the pre-sentence report.

16

We accept Chaplain Gates's and Ms. Ganci's statements as to Mr. Brunetti's return to society. They offer views without considering the nature of his offense and need to promote respect for the law.

### 3.   We cannot grant compassionate release under section 3553.

Mr. Brunetti offers three sources of updated information on his rehabilitation.  We credit his hard work and support of his fellow man while incarcerated. We credit Ms. Ganci's statement as different than the unopposed statement recorded in the presentence report. But even if we thought Mr. Brunetti established extraordinary and compelling reasons for compassionate release, we still cannot justify release based on this new information. Mr. Brunetti planned to kill rivals in organized crime. Judge Buckwalter sentenced him to forty years of incarceration followed by three years of supervised release. We expect rehabilitation and growth while incarcerated. Mr. Brunetti appears to have done so in many ways. But we are not a parole board reducing sentences for good behavior while incarcerated. We find no basis for a modifying Judge Buckwalter's sentence after applying Congress's sentencing factors.

## III.  Conclusion

Salvatore Brunetti is currently serving a forty-year sentence for conspiracy and attempted murder in furtherance of an organized crime enterprise led by John Stanfa in the early 1990s. The jury found Mr. Brunetti made bombs and planned murders. Now seventy-four years old and nearly twenty-eight years into his sentence, Mr. Brunetti moves a second time for compassionate release, arguing his obstructive coronary artery disease combined with his age present extraordinary and compelling reasons warranting release. He also offers his facility's internal risk assessment tools confirming his present character, as well as statements from his chaplain and former wife who now recants her statement in the presentence report reviewed by counsel and Judge Buckwalter before

imposing sentence. We credit Mr. Brunetti's rehabilitation efforts. We look forward to his return to society upon serving his warranted sentence. But we have no present grounds for compassionate release. After analyzing the parties' briefing and updated medical records, we deny Mr. Brunetti's second Motion for compassionate release as he fails to show extraordinary and compelling reasons. Even if we could find his continuing heart health issues presently being treated represent a serious deterioration of his health, we cannot presently find grounds for release after applying Congress's mandate we impose and confirm sentences to promote respect for the law after considering the seriousness of the offense.

---

[1] Presentence Report ("PSR") at ¶ 22.

[2] PSR at ¶ 24.

[3] *Id.*

[4] PSR at ¶ 28.

[5] PSR at ¶ 25.

[6] PSR at ¶ 28.

[7] PSR at ¶ 28.

[8] *Id.*

[9] PSR at ¶ 33.

[10] PSR at ¶ 59.

[11] PSR at ¶ 60.

[12] *Id.*

[13] PSR at ¶ 64.

[14] *Id.*

[15] *Id.*

[16] PSR at ¶ 35.

[17] PSR at ¶¶ 36–38.

[18] PSR at ¶ 46.

[19] PSR at 1.

[20] ECF Doc. No. 807.

[21] *Id.*

[22] *See* ECF Doc. No. 1994 at 2–5.

[23] ECF Doc. No. 1976.

[24] ECF Doc. Nos. 1994, 1995.

[25] *See* ECF Doc. No. 1994.

[26] ECF Doc. No. 1998.

[27] *See* ECF Doc. No. 1994 at 5–6 (detailing Mr. Brunetti's medical history including a history of thymoma in his chest, history of pain at the incision site removing the thymoma, shortness of breath, and eye conditions including hypertensive retinopathy, branch retinal vein occlusion, epiretinal membrane, and cataracts for which he is prescribed medication, a 2016 stroke with lingering complications in his right hand, pre-ventricular contractions, and a history of kidney stones).

[28] ECF Doc. No. 2021 at 193, 251, 310 (all references to the medical records at ECF Doc. No. 2021 use the pagination assigned by the CM/ECF docketing system).

[29] *Id.* at 120, 191, 268.

[30] *Id.* at 268.

[31] *Id.*

[32] *Id.*; ECF Doc. No. 2018 at 52 (using the pagination assigned by the CM/ECF docketing system).

[33] ECF Doc. No. 2021 at 268.

[34] *Id.*

[35] *Id.* at 21. The Centers for Disease Control and Prevention, relying on The American College of Cardiology/American Heart Association Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults, considers normal blood pressure of less than 120 mm Hg systolic over less than 80 mm Hg diastolic; elevated blood pressure of 120 – 129 mm Hg systolic over less than 80 mm Hg diastolic; and high blood pressure—considered hypertension— of 130 mm Hg systolic or higher and 80 mm Hg diastolic or higher.
*See* https://www.cdc.gov/bloodpressure/about.htm (last visited March 7, 2022).

[36] ECF Doc. No. 2021 at 236.

[37] The prefix "peri" means "around, about, near"; "infarct" is defined as "[a]n area of necrosis resulting from a sudden insufficiency of arterial or venous blood supply"; and "ischemia" is defined as "[l]ocal loss of blood supply due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood vessel." Stedman's Medical Dictionary (28th ed. 2006).

[38] ECF Doc. No. 2021 at 5.

[39] *Id.* at 236–38.

[40] *Id.* at 5–6, 237–38.

[41] *Id.* at 8. According to the CDC, a blood pressure reading of 115/64 is considered normal. *See supra* n.35.

[42] ECF Doc. No. 2021 at 2–4.

[43] ECF Doc. No. 2018 at 26–27.

[44] *COVID-19 Coronavirus*, Federal Bureau of Prisons, *available at* www.bop.gov/coronavirus/ (last visited March 8, 2022).

[45] *COVID Data Tracker*, Centers for Disease Control and Prevention, *available at* https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=New+Jersey&data-type=Risk&list_select_county=34005 (last visited March 8, 2022).

[46] *Id.*

[47] *Id.*

[48] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited March 7, 2020).

[49] ECF Doc. No. 2018 at 4, ¶ 12; 28-31.

---

[50] ECF Doc. No. 2029 at 13, Exhibit "B."

[51] *Id.* at 12, Exhibit "A."

[52] 18 U.S.C. § 3582(c)(1)(A).

[53] 12 F.4th 255 (3d Cir. 2021).

[54] *Id.* at 259–60.

[55] *Id.* at 260.

[56] U.S.S.G. § 1B1.13. Mr. Brunetti does not claim he meets the definition of "extraordinary and compelling reasons" under the Family Circumstances Note or Other Reasons Note.

[57] Mr. Brunetti asserts he satisfied the exhaustion requirement by filing his first motion for compassionate release and by filing another request for release with FCI Fort Dix Warden Lamine N'Diaye on October 29, 2021. *See* ECF Doc. No. 2018 at 39 (using the pagination assigned by the CM/ECF docketing system). He contends he received no response. The United States does not challenge Mr. Brunetti's exhaustion of administrative remedies.

[58] ECF Doc. No. 1994 at 10.

[59] ECF Doc. No. 2019.

[60] U.S.S.G. § 1B1.13 cmt. (1)(A), (B).

[61] ECF Doc. No. 2018 ¶ 5.

[62] *Id.* at 3, ¶ 5.

[63] *Id.* at 14.

[64] *Id.* at 44–47, 52, Appendix 2–5, 10.

[65] There are inconsistencies in the medical records surrounding cardiac catheterization. For example, St. Francis Medical Center notes the result of the cardiac catheterization as "obstructive coronary artery disease of the [right coronary artery]" but a clinical encounter note from the Bureau of Prisons on December 10, 2021 (the hospital discharge date) notes the catheterization showed "non obstructive disease" and "no stents were placed." *Compare* ECF Doc. No. 2021 at 236, *with id.* at 12. Mr. Brunetti reported to a dentist on December 27, 2021 he had a stent placed "a few weeks ago." *Id.* at 208. Discharge instructions from St. Francis Medical Center note the diagnosis of non-obstructive coronary artery disease and a care plan or return to prior level of function and

return to previous diet with the health goal of maintaining an active lifestyle as tolerated. *Id.* at 241. On the other hand, the hospital noted obstructive coronary artery disease. *Id.* at 244–45.

[66] ECF Doc. No. 2018 at 20.

[67] U.S.S.G. § 1B1.13, cmt. (1)(A)(ii).

[68] *See* ECF Doc. Nos. 1984, 2021.

[69] *Garrett v. Murphy*, 17 F. 4th 419, 433 (3d Cir. 2021) (quoting *United States v. Burgard*, 857 F. App'x 254, 255 (7th Cir. 2021)).

[70] *See, e.g.*, *United States v. Webb*, No. 09-755, 2022 WL 206174, at *4 (E.D. Pa. Jan. 24, 2022) (citing *United States v. Riddick*, No. 95-73-1, 2022 WL 138074, at *4 (E.D. Pa. Jan. 14, 2022)).

[71] *See COVID-19 Risks and Vaccine Information for Older Adults*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last visited March 7, 2022).

[72] U.S.S.G. § 1B1.13 cmt. (1)(A).

[73] ECF Doc. No. 1994. We found Mr. Brunetti met the other two requirements: he is over sixty-five years old and has served at least ten years of his sentence. *Id.*

[74] Other judges may find heart conditions like those faced by Mr. Brunetti may constitute sufficient medical grounds to allow a finding of extraordinary and compelling reasons for compassionate release. But we are also mindful those judges, like we did in July 2020 and today, further study whether release comports with Congress's sentencing factors. For example, in *United States v. Glenn*, the United States conceded risk factors including heart disease and hypertension meet the definition of "extraordinary and compelling reasons" for release under U.S.S.G. § 1B1.13. Judge Slomsky assumed, without deciding, diabetes presents an extraordinary and compelling reason for release and did not consider heart disease and hypertension. Judge Slomsky found the vaccinated petitioner failed to meet his burden of showing extraordinary and compelling reasons to justify granting release and, even if he did meet his burden, the section 3553(a) factors did not support release. *Glenn*, No. 15-99, 2021 WL 3190553, at *6–8 (E.D. Pa. July 28, 2021). In *United States v. Mainor*, Judge Beetlestone found petitioner's coronary artery disease for which he underwent open heart surgery requiring quadruple bypass, high blood pressure, and high cholesterol, his age (fifty-five years old), former smoker status, and medications taken to treat his medical conditions together qualified as extraordinary or compelling reasons for release during COVID-19. *Mainor*, No. 06-1401-1, 2021 WL 183309, at *2 (E.D. Pa. Jan. 19, 2021). Judge Beetlestone cited CDC guidelines, including heart disease, former smoker status, and high blood pressure as increasing the risk of severe illness from COVID-19 but denied the petitioner's motion for compassionate release based on the section 3553(a) factors, citing the seriousness of petitioner's underlying offenses, his successful recovery from a recent COVID-19 infection, and demonstrated ability of the correctional facility to treat petitioner's underlying medical conditions. *Id.* at *3–4. *See also*

*United States v. Wyatt*, No. 97-3015, 2020 WL 3643467, *5-*9, *10 (N.D. Iowa July 6, 2020) (seventy-six-year-old petitioner's medical conditions including severe coronary artery disease, hypertension, hyperlipidemia, and carotid artery stenosis constitute a "serious deterioration in physical health because of the aging process" constituting extraordinary and compelling reasons but denying compassionate release after considering the section 3553(a) factors).

[75] *See* ECF Doc. No. 1994. The applicable section 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
… [and]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a).

[76] ECF Doc. No. 2018 ¶¶ 5, 7, 8–12.

[77] *Id.* at 57–71; Appendix at 15–45, 72–87.

[78] ECF Doc. No. 2018 at 4 ¶ 12; 28-26.

[79] ECF Doc. No. 2029 at 13, Exhibit "B."

[80] *Id.* at 12, Exhibit "A."

[81] ECF Doc. No. 2018 at 71, Appendix 29.

[82] ECF Doc. No. 2018 at 31. Mr. Brunetti briefly argues he would have received a shorter sentence which "would have been completed … by this point of time" under today's Sentencing Guidelines. ECF Doc. No. 2018 at 35. The United States disagrees given the circumstances of his crimes and, in any event, the length of sentence as valid when entered is not a basis for compassionate release under *Andrews*, 12 F.4th at 260–61. *See* ECF Doc. No. 2020 at 3 n.1. We agree with the United States. Under *Andrews*, "[t]he duration of a lawfully imposed sentence does not create an extraordinary or compelling circumstance" because "there is nothing 'extraordinary' about leaving untouched the exact penalties that Congress prescribed and that a district court imposed for particular violations of a statute"; "[t]he imposition of a sentence that was not only permissible but

statutorily required at the time is neither an extraordinary nor a compelling reason to now reduce the same sentence"; and "[c]onsidering the length of a statutorily mandated sentence as a reason for modifying a sentence would infringe on Congress's authority to set penalties." *Andrews*, 12 F.4th at 260–61 (quoting *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021); *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) and citing *Gore v. United States*, 357 U.S. 386, 393 (1958)).

[83] 18 U.S.C. § 3631(b)(1)–(4).

[84] *The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Department of Justice, Office of Attorney General. *See The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Dep't of Justice, *available at* https://nij.ojp.gov/first-step-act/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf (last visited March 7, 2022).

[85] *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, January 2021, at 2, available at https://www.ojp.gov/pdffiles1/nij/256084.pdf (last visited March 7, 2022).

[86] *Id.* at 12–13.

[87] *Id.* at 14–15.

[88] *Id.* at 16.

[89] ECF Doc. No. 2018 at 71; Appendix 29.

[90] March 26, 2020 Memorandum from Attorney General William Barr to Director of Bureau Prisons, available at https://www.justice.gov/file/1262731/download (last visited March 7, 2022).

[91] *United States v. Abreu*, No. 16-233, 2021 WL 1884788, at *6-7 (E.D. Pa. May 11, 2021). *See also United States v. Straite*, No. 11-321-1, 2022 WL 446048 (M.D.N.C. Feb. 14, 2022) (third motion for reduced sentence denied with no showing of extraordinary and compelling reasons and rejecting petitioner's argument his good behavior, education and vocational courses and programs in prison, and PATTERN score of "low" shows he is no longer a danger to community); *United States v. Burman*, No. 16-190, 2021 WL 681401 (S.D.N.Y. Feb. 21, 2021) (second motion for compassionate release denied finding petitioner did not show medical conditions constitute extraordinary and compelling reasons and rejecting petitioner's argument his PATTERN score of "minimum" and other educational and rehabilitation classes in prison show he is not a danger to the community); *United States v. Krueger*, No. 09-103, 2021 WL 535479 (E.D. Wisc. Feb. 12, 2021) (motion for compassionate release denied where United States conceded petitioner may be able to establish extraordinary and compelling medical releases for sentence modification but court found danger to the public despite PATTERN risk assessment of "minimum").

[92] *United States v. Gustafson*, No. 16-133, 2020 WL 4877252, at *7, *11-13 (W.D. Pa. Aug. 20, 2020). Mr. Brunetti cites *Gustafson* in support of his argument we should consider his PATTERN

score as Judge Hornak did to find he is not a danger to the community. Mr. Brunetti also cites *United States v. Taylor*, No. 15-108, 2020 U.S. Dist. LEXIS 193381 (E.D. La. Oct. 20, 2020) to support his argument his minimum PATTERN score demonstrates he is not a danger to the community. In *Taylor*, Judge Barbier found petitioner's coronary artery disease, along with the increased risk of mortality from COVID-19, is an extraordinary and compelling reason to grant compassionate release and his "minimum" PATTERN score, among other considerations, demonstrate the petitioner is not a danger to the community and otherwise meets the section 3553(a) sentencing factors. *Id.* at \*7-8. *See also United States v. Rodriguez*, No. 05-960, 2022 WL 158685 (S.D.N.Y. Jan. 18, 2022) (motion for reduction in sentence granted based on showing of medical conditions constitute extraordinary and compelling reasons and harsh circumstances of imprisonment, age at release (sixty-years-old), educational opportunities in prison, and "minimum" PATTERN score); *United States v. Greene*, 516 F. Supp. 3d 1 (D.D.C. 2021) (granting motion for compassionate release by seventy-two-year-old petitioner who served forty-nine years of his sentence, considering medical conditions, including hypertension and undiagnosed congestive heart failure, PATTERN score of "minimum," Bureau of Prisons support for release, efforts taken in prison to rehabilitate, saving the lives of correctional officers during a prison riot, and no serious disciplinary history weigh in favor of release); *United States v. Hearron*, No. 91-392-2, 2020 WL 4569556 (D.Az. Aug. 7, 2020) (motion for compassionate release by eighty-two-year-old petitioner who served thirty years of life sentence granted based on medical conditions and age granted, considering PATTERN score of "medium").

[93] ECF Doc. No. 2029 at 13, Exhibit "B."

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] ECF Doc. No. 2029 at 12, Exhibit "A."

[98] PSR at ¶ 311.